[MONROE GENERAL TERM, March 4. 1867. *J. C. Smith, Welles* and *Johnson,* Justices.]

(*a*) The above decision was affirmed, unanimously, by the Court of Appeals, in September, 1867. But that court did not pass upon the question whether the statement furnished by the agent, to the assessors, was conclusive as to the amount to be taxed. (*See* 37 *N. Y. Rep.* 344, 349.)

53 555,<br>71h 464|

## THE PEOPLE, *ex rel.* Inman S. Lowell, *vs.* THE BOARD OF TOWN AUDITORS OF THE TOWN OF WESTFORD.

On the 15th day of March, 1864, fifteen proper persons signed a call for a special town meeting of the town of Westford, "for the purpose of paying bounties to volunteers in the military or naval service of the United States, during the existence of the war now carried on." The town clerk posted notices for one, following the language of the call. At the town meeting a resolution was offered that "there be paid $300 to each man drafted, and not *exempted.*" It was amended so as to include those who were drafted the year before and paid $300, and, as amended, was passed. On the 8th of June, 1864, the relator was drafted as one of the quota of the town, under the call of December 17, 1864, and paid $300, commutation. In April, 1865, the legislature passed an act legalizing the proceedings of town meetings in the county of Otsego, (the town of Westford being therein,) relating to the payment of *bounties* to volunteers, substitutes and *drafted men.*

*Held:* 1. That the relator was not *exempted,* within the meaning of the excep-

tion in the resolution, and that it should not be restricted so as to include only those who were drafted and actually entered the service.

2. That it applied to persons *thereafter* drafted under an impending call of the president.

3. That the resolution was not void, as contrary to the policy of the general government, for the reason that it tended to keep. *men* out of the service.

4. That the repayment of the $300 commutation was a "bounty," within the act of the legislature.

5. That the defendants should not have been required *forthwith* to assemble and audit the relator's claim, but the mandamus should have ordered them to do so at their next annual meeting.

APPEAL from an order awarding a peremptory mandamus requiring the defendants forthwith to assemble and audit the relator's claim against their town.

On the 15th of March, fifteen persons, eligible to the office of supervisor of the town of Westford, signed a call for a special town meeting of said town "for the purpose of paying bounties to volunteers in the military or naval service of the United States during the existence of the war now carried on, and for the purpose of paying the incidental expenses of such volunteering, and of raising such money." This call was filed in the clerk's office March 16, 1864. On the 18th of March, 1864, the clerk posted four notices for a special town meeting, on the 26th, following the language of the call. On the 26th of March a special town meeting was held at the place designated, when a resolution, of which the following is a copy, was passed: "Resolved, that there be paid the sum of three hundred dollars to each man drafted and not exempted, and the same be raised by a tax upon the taxable property of the town." The resolution was amended so as to include those that were "drafted last year and paid $300." The town clerk, on the day of its passage, put this resolution away in a pigeon hole in a desk of his office, without any indorsement. Two years after, on the 17th of March, 1866, a claim was presented, when Erasmus Snyder, the then town clerk, found it in the clerk's office, and indorsed

The People *v.* Auditors of Westford.

on it, "Resolution passed March 15, 1864," (the date of the call, instead of the town meeting.) During 1864 the relator was a resident of the town of Westford. On the 8th of June, 1864, he was drafted for three years, as one of the quota of the town, under the call of the president of October 17, 1863. On the 23d of June, 1864, pursuant to notice, he appeared before the board of enrollment, was not exempted, and paid $300 commutation. On the 14th of April, 1865, an act relating to the counties of Otsego and Herkimer was passed, as follows : "All acts and proceedings * * of legally convened town meetings * * relating to the payment of bounties to volunteers, substitutes and drafted men, * * are hereby legalized, confirmed and made valid." (*Laws of* 1865, *ch.* 440, *p.* 800, § 1.) At the annual meeting of the board of town auditors, (Nov. 7th, 1867,) the relator presented an account for $300, with a copy of the papers, and requested them to audit and allow the claim, which they refused to do. He applied for a mandamus, which was granted at a special term, commanding them forthwith to assemble and audit the account.

*J. E. Dewey,* for the defendants, appellants.

*N. C. Moak,* for the relator, respondent.

*By the Court,* PARKER, J. This is an appeal from an order made at special term granting a peremptory *mandamus* requiring the defendants forthwith to assemble and allow the relator's claim of $300 against the town.

This claim arose as follows: On the 24th of March, 1864, the town of Westford, at a special town meeting held on that day, passed the following resolution : "Resolved, that there be paid the sum of three hundred dollars to each man drafted, and not exempted, and the same be raised by a tax upon the taxable property of the town."

The resolution was amended so as to include those that were "drafted last year and paid three hundred dollars."

The relator, a resident of the town of Westford, on the 8th day of June, 1864, was duly drafted into the military service of the United States for three years, and on the 23d of June, 1864, paid to the proper officer $300, and was discharged from further liability under that draft. On the 14th of April, 1865, a local act, relating only to the counties of Herkimer and Otsego, was passed, so much of which as applies to the question before us is as follows : "All acts and proceedings * * of legally convened town meetings * * relating to the payment of bounties to volunteers, substitutes and drafted men, * * are hereby legalized, confirmed and made valid." (*Laws of* 1865, *ch.* 440, § 1.) On the 7th of November, 1867, the relator presented to the board of town auditors of the town of Westford his claim for the amount so paid by him, accompanied by the requisite proofs. The board passed upon and rejected the claim, and refused to audit and allow the same.

The claim was then, and is now, resisted on the grounds that the resolution does not apply to the relator's case, inasmuch as he was drafted, and *exempted* from *military service,* whereas the resolution provides for the payment of $300 to "each man drafted and *not* exempted ;" and that the act of the legislature legalizes proceedings of town meetings relating to the payment of *bounties* to volunteers, substitutes and drafted men, and to no other payments. It is argued by the counsel for the appellants, that the resolution, and statute legalizing it, should be so construed as to harmonize with the then existing circumstances, and the wants and policy of the government—the call being for men and not money ; and that in the light of those circumstances, the resolution should be deemed intended to induce drafted men to go into the service, instead of to furnish them means, raised from tax-payers,

with which to procure their *exemptions* from the performance of the personal duty imposed upon them by the government and the laws; that it was intended to pay men for going into, and not for staying out of, the army.

The 18th section of the act of congress, approved February 24, 1864, is as follows: *"And be it further enacted,* that the following persons be and they are hereby exempted from enrollment and draft, under the provisions of this act, and of the act to which this is an amendment, to wit: such as are rejected as physically or mentally unfit for the service; all persons actually in the military or naval service of the United States at the time of the draft; and all persons who have served in the military or naval service two years during the present war, and been honorably discharged therefrom; and *no persons but such as are herein exempted shall be exempt."*

The exemptions here provided for might, under the act, be claimed, and passed upon by the board of enrollment, after the persons claiming them had been drafted and notified. By the 13th section of the act of congress, approved March 3, 1863, (of which the act of February 24, 1864, is an amendment,) it is provided, "that any person drafted and notified to appear as aforesaid, may, on or before the day fixed for his appearance, furnish an acceptable substitute to take his place in the draft; or he may pay to such person as the secretary of war may authorize to receive it, such sum, not exceeding three hundred dollars, as the secretary may determine for the procuration of such substitute, * * and thereupon such person so furnishing the substitute, or paying the money, shall be discharged from further liabilty under the draft."

Taking the resolution of the town and the acts of congress together, there can be no difficulty, I think, in understanding the meaning and intent of the resolution.

The objection of the appellants, to the allowance of the claim, rests upon the meaning which they apply to the

term, *not exempted.* The sum voted, they say, was to be paid "to each man drafted, and not exempted;" that is, as the words "*not exempted*" have a general signification, and are not at all restricted in the resolution—not exempted in any way or for any cause, whatever—and the relator, although drafted, yet upon paying his $300, became thereby exempted from military service, the effect of the draft, and therefore is not, within either the terms or spirit of the resolution, entitled to the money from the town.

It is quite true, as the appellant's counsel insists, that in giving construction to the resolution, we should keep in mind the circumstances, wants and policy of the government, as they appear and are expressed in these acts of congress. And it is also true, that as the resolution was passed with special reference to the provisions of these acts, the language adopted in it should be construed in view of that fact. Thus we see that, under the acts, the payment of a sum to be fixed by the secretary, not exceeding $300, by a drafted person, is not declared to *exempt* him from military service, but to entitle him to be "discharged from further liability under that draft;" while another provision of said acts prescribes that "persons physically or mentally unfit for the service," with others enumerated, (*not including drafted persons paying the* $300,) and no others, *shall be exempt.* Where, therefore, the resolution says, "there shall be paid to each man drafted and *not exempted*," the same meaning should be given to the term *exempted* as is given to it in the acts of congress, and it should be understood to mean, not *exempted*, as being persons specified in the 10th section of the act of February 24, 1864, who are the only exempts allowed by the law.

Against this construction I do not see any thing in the needs of the service or the policy of the government. By these acts of congress it had been assumed that the pay-

The People *v.* Auditors of Westford.

ment, by a drafted man, of $300, was equivalent to the procurement of a substitute. The money was paid by the drafted man to the government for that purpose, and the government undertook, in his stead, to procure the substitute. Under this policy the drafted man who paid $300 was treated by the law, and should, for the purposes of the question before us, be considered as having fulfilled his personal obligations in the premises, as fully and completely as if he had, himself, gone to the field and there performed the duties of a soldier. And the reason for refunding him the money he had so paid for a substitute, was the same as though he had himself procured the substitute. And as a question of governmental policy and of strict justice, there was equal reason for providing that the tax-payers of the town should pay him back what he had thus paid to the government, as for paying him the same sum for himself procuring a substitute, or becoming a soldier. In either case it is to be presumed he furnished a soldier for the government, and it was just and right that his fellow townsmen should share with him the loss thereby incurred.

The amendment to this resolution, which made it include those who were drafted the year before, and who paid $300, tends strongly to show the intent to have been as we have above construed it.

The idea that the voters who passed the resolution intended to restrict the payment to such drafted men as should themselves enter the military service of the country, is contradicted by the fact that they put those of the previous year who did not go, but paid, in the same category with those for whom they now provide the $300. The mind of the voters upon the point in question is indicated by the amendment. No reason appearing for the difference, it is not to be presumed that they intended, so far as the resolution might operate, to enforce the draft personally, against those to be drafted, while they allowed

payment for a substitute to those drafted the year before. The intent as to those drafted last year being clear, beyond dispute, greatly strengthens the conclusion at which we have arrived, of a like intent as to those to be drafted the then present year, even if such intent is less clearly expressed in the resolution. I have no doubt that the relator's case is covered by the resolution.

I think, also, the act of the legislature includes the resolution in its legalizing effect. No question is made but that the town meeting which passed the resolution was legally convened. It is insisted, however, that the acts and proceedings of such town meetings relating to the payment of *bounties* to volunteers, substitutes and drafted men, alone are confirmed. And *bounties*, it is said, were given, in accordance with the meaning of the word, to induce men to enlist into, or to enter, the military service of the country. Hence it is argued that the confirmatory act does not apply to such a case as that of the relator.

I can see no reason, either from the signification of the word, or from any other cause, for construing the word *bounties*, in its application to drafted men, as meaning payments to those, and those only, who served personally in the army. Drafted men were, in no sense, *volunteers*, and whatever provision was made for them, either by towns or counties, was made, not to *induce* them to enter the service, but as a gift or bounty, to indemnify them for having been drawn into it, against their will. As already shown, the policy of the government did not require or prefer the personal service of the drafted man, but accepted as a full performance of his duty the procurement of a substitute, by himself, or through the agency of the government, upon payment by him of the price. It is a well known public fact, that it was not the custom in resolutions for payments to drafted men to make it a condition that they should do military service in their own proper persons. I do not think such a case can be found, or ever

The People *v*. Auditors of Westford.

happened. When the act, then, speaks of *bounties* to volunteers, substitutes and *drafted men*, it means, as applied to drafted men, such gifts or bounties as are ordinarily voted to them, bounties in one sense, as being voluntary bestowments, and used in that sense, the other being manifestly inapplicable.

The relator being entitled to the amount claimed by him from the town, it was the duty of the board of auditors to audit and allow the claim; this being the mode prescribed by law for putting it in condition to be provided for by the board of supervisors of the county. A mandamus was the proper remedy for the relator, upon the refusal of the board of auditors to perform that duty. (*People* v. *Board of Supervisors of N. Y.*, 32 *N. Y. Rep.* 473. *People* v. *Taylor*, 30 *How.* 78, 86.)

The mandamus in this case required the defendants to assemble *forthwith* and audit and allow the relator's claim. There is no provision of law authorizing boards of town auditors to hold *special* meetings; the town officers composing the board are to meet annually on the last Thursday preceding the annual meeting of the board of supervisors of the county, at which meeting they are to audit and allow the accounts of all charges and claims payable by their respective towns. (3 *Gen. Stat.* 302, 303.) The statute having thus fixed the time when they shall meet and perform their duties as auditors, and not having authorized any other meeting, I am inclined to think it is not competent for them to meet and perform those duties at any other time. It is by virtue of special statutory authority that boards of supervisors hold special meetings. (*Laws of* 1838, *ch.* 314, § 5.)

The order appealed from should be so modified as to direct the writ therein allowed to require the defendants as the board of town auditors of the town of Westford, instead of assembling forthwith, and auditing and allowing the relator's account, &c., at their next annual meeting,

to audit and allow the amount, charge and claim, &c., as in said order specified. And the writ issued upon said order should be amended accordingly. Neither party should be allowed costs of this appeal.

Decision accordingly.(*a*)

[BROOME GENERAL TERM, July 21, 1868. *Balcom, Boardman, Parker* and *Murray,* Justices.]

(*a*) Affirmed by the Court of Appeals, June, 1869.